| | |
|---|---|
| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |

UNITED STATES OF AMERICA, §
§
      Plaintiff, §
§
*versus* § CRIMINAL H-06-424
§
VALENTINE MARITNEZ, §
§
      Defendant. §

# Opinion on Suppression

1. *Introduction.*

    The emergency-service button in a man's car went off. After getting no response from the car, the service company alerted the police. The police investigated, found the car, questioned the occupant, and saw a gun in the car. The owner was arrested and charged with being an alien in possession of a firearm. The owner complained the search was illegal and moved to suppress the gun. The gun is admissible.

2. *OnStar.*

    Valentine Martinez owns a 2003 Cadillac Escalade that is equipped with OnStar. OnStar is a General Motor's service that links a car to the service through a satellite. It allows for two-way communication between the driver and operator, and it tracks the vehicle through a transponder. When drivers have an emergency – accident, threat, or illness – they press the OnStar button and are connected to an operator. The operator then contacts the police, wrecker, or paramedics to assist the driver. If the car's occupants do not respond, the operator calls the police with the car's location.

    Late on the night of October 30, 2006, the OnStar button in Martinez's car was pressed. The operator tried to communicate with whoever was in the car but got no response. The operator then called the Houston police, and she asked them to investigate. Officer Bob Conley was on patrol in the area where the car was last reported by the OnStar transponder.

3. *Found.*

Conley saw a car matching the description from OnStar in the service yard of a tire store, just off a heavily-trafficked Houston street. He pulled into the lot and up to the gate leading to the yard on the side of the shop, where the Cadillac was parked. The yard was well-lit and enclosed by a see-through, chain link fence. The vehicle-access gate in the fence was open, and seven or eight men were near an open door to a service bay behind the shop, drinking and working on other cars.

Conley walked up to the car and saw Martinez leaning into it, half-sitting in the driver's seat. Music was playing loudly on the car radio. Conley asked Martinez to step away from the car. He asked Martinez for identification and whether he owned the car. The exchange between the two was hampered by Martinez's speaking little English, but he did not show Conley his only identification – a Mexican driver's license.

Conley got into the car to turn the music down and press the OnStar button to talk to the operator about the car's owner. The officer saw a pistol partially exposed on the car's console. After additional officers arrived, Conley arrested Martinez for illegally possessing a firearm in violation of state law. Martinez was later charged federally with possessing a firearm as an alien. 18 U.S.C. § 922(g)(5) (1993).

Martinez moved to suppress the gun saying that the officer's search of the car was improper. At the hearing, Martinez's account of the incident differed from the officer's. He claimed that the car had not moved for several hours and that he was not in the car when Conley arrived at the shop.

4. *Recording.*

Martinez offered an OnStar recording that he said contradicted Conley's assertion that he found the gun in plain view in the car's interior. In particular, Martinez points to the section of the barely intelligible recording when someone is heard to say "glovebox," a click is heard, and another voice remarks on the gun. These sounds come within a few seconds of one another. The voices sound like native English speakers.

Martinez cannot place these in context. There is simply no way of telling when the remarks and noises Martinez says are proof of an illegal search occurred. They could have occurred, not at the moment Conley first spotted the gun, but rather many minutes later, after Conley had already arrested Martinez and was securing the vehicle with backup officers. The words about the gun are just a comment rather than an exclamation of discovery as Martinez argues.

5.  *Least Intrusive.*

Martinez says that the officer should have used the least-intrusive means to investigate the OnStar alert. He argues that this applies to the officer's entry into the tire shop's work yard and his entry into the car. He says Conley should have stayed back on the street or, at least, in the public parking lot for the shopping center, and called OnStar to get more information about the car and its owner.

The Constitution prohibits unreasonable searches by the government. The reasonableness of a search turns on whether the intrusion into an individual's property or person is outweighed by the government's legitimate interest in the search as justified by the facts supporting it at the time. Searches should be focused in their object and no more intrusive than necessary. *New York v. Benigno*, 472 U.S. 106, 118 (1986). In the context of responding to an alert from an emergency service, Officer Conley's search was reasonable.

6.  *Tire Shop.*

It was midnight. At least one of the service-bay overhead doors was open. The lights were on. Six to eight people were in the side yard. It was a yard to the north of the tire store that opened directly into the parking lot across which was a six-lane heavily-trafficked Houston street. The side yard was protected by a six-foot, chain-link fence without any sight-blocking material. Both sides of the vehicle access gate were open.

The Cadillac was in plain view, and some of its doors were open. The officer parked outside the gate, blocking exit through it to the street. He approached. Conley says that he found Martinez leaning in the car – sitting on the driver's seat with, at least, one leg on the ground. The music was blaring.

Martinez testified that he was sitting in a white plastic chair against the wall of the shop on the far side of the car with his friends and co-workers when Conley arrived. Martinez said he went around to the driver's side front door only when Conley gestured for him to come.

Conley's version of the facts is substantially more likely to be true. Conley would not have known to gesture to Martinez. He could have only gestured to all seven of them. Conley would have not wanted all seven men to come over and be with him while he was there alone. Martinez's testimony about when the music was on and off and how long the car had been at the shop are discounted since the very satellite computer system

that caused the problem in the first place reported the car to have been moving within the preceding fifteen or twenty minutes.

An officer who responds to a distress call is not obliged to use the least intrusive means of responding to the distress call in order to avoid *accidentally* discovering evidence of a crime. The officer is invited to respond to the call by the owner only for the purpose of responding to that call and not for the purpose of his roaming around to see whether there is something of interest to law enforcement on the premises.

In this case Conley was not obliged to stand in the public parking lot and call an 800 number for OnStar and wait for them to turn off the alarm. Even if Conley had recognized Martinez as the owner of the vehicle, he still would not be obliged to stay outside instead of coming up to ask what the problem had been. Martinez could have been standing there saying everything was fine under duress from the other men around him or from someone hidden in the car.

A distress call is not a license for the officer to do whatever he wants. This is parallel to a burglar alarm's going off and, when the homeowners cannot be reached, the officer's going into the building and inadvertently discovering contraband. *See United States v. McCullough*, 457 F.3d 1150, 1164 (10th Cir. 2006).

Conley did not trigger the alarm to have an excuse to enter. That would be illegal. The least intrusive means is a good rule; but in a response to a distress cry, the officer is allowed to focus on the apparent emergency.

This is also similar to Martinez's drowning in the river and crying for help. Conley dives in to rescue him. In the process of dragging him to safety Conley discovers, Martinez has a gun in his belt. Conley is not required to rescue him by lassoing him or finding a life ring, so he is less likely to find inculpatory collateral information.

Whether Martinez knew that the OnStar button was pressed is irrelevant. Martinez chose to buy a car with that service. The service alerted the police to a possible problem with the car. The police reasonably investigated that alert.

7. *Cars and Searches.*

The Constitution guarantees that the government will not unreasonably search people's homes, papers, and effects. U.S. CONST. amend. IV. Despite having not been invented at the time of the framing, cars are also protected from the government. Some cases have held that citizens have a diminished expectation of privacy in their cars for reasons that fail to reflect how Americans actually perceive and use them.

A number of these rely on the fact that cars travel on public roads. *See, e.g., Cardwell v. Lewis*, 417 U.S. 583, 590 (1974). If this reasoning were taken to its logical conclusion, people would also have a diminished expectation of privacy in their homes because homes are located directly on public thoroughfares. People do not lose their expectation of privacy in mail and luggage merely because these items travel the public road. *See Ex Parte Jackson*, 96 U.S. 727, 733 (1877) (mail); *Bond v. United States*, 529 U.S. 334, 338 (2000) (luggage).

Other opinions have posited a diminished expectation of privacy based on the state's pervasive regulation of cars. *See South Dakota v. Opperman*, 428 U.S. 364, 368 (1976). Homes are also heavily regulated – from building inspections, zoning ordinances, and child-welfare inspections. Distinguishing one receptacle of a person's effects from another on the level of attention from the administrative state simply has no cogency.

Aside from purchasing a home, a car is typically the largest investment a person makes. In today's mobile culture, people spend large amounts of time in their cars and outfit them with many personal effects. People do not expect others to meddle with their cars – be the meddlers their friends, strangers, or Big Brother.

As with any other search, the Constitution requires that the search of a car be reasonable. To be reasonable there needs to be an immediate, objective basis for the officer to make the search. There must be facts supporting a belief that the officer is acting in furtherance of a legitimate government interest.

Martinez argues that Conley's entry into his car was unreasonable.

In one case, the police officer testified that it was his standard practice to search every car where the driver got out of the car before he had approached the driver's window. *United States v. Hunt*, 253 F.3d 227, 232 (5th Cir. 2001). Standard practices are facially bad; they cannot be narrowly tailored to the circumstances. The case failed because of that.

In another one, the driver was unlicensed and intoxicated. The court held that it was not unreasonable for the officer to put his head through the window to see whether a passenger was capable of taking custody of the van. *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993).

In another, the passenger claims to be a paraplegic and cannot get out. The officer pats him for a weapon and discovers one. Since it would have been lawful to pat him if he had left the car, it is lawful to pat him down when he claims to be physically unable to move. *United States v. Meredith*, 480 F.3d 366, 370 (5th Cir. 2007).

The officer in another case stuck his head in the car to move the papers out of the way to see whether the vehicle identification number on the dashboard could be read after his having not found it on the door. Under the papers was a vehicle identification number and a pistol. That was constitutionally acceptable. *New York v. Benigno*, 475 U.S. 106, 119 (1986).

Conley testified that he saw the gun before entering the car – when he was standing by its open door. The search was reasonable if the gun was plainly visible from outside. *United States v. Hensley*, 469 U.S. 221, 235 (1985).

Even if Conley had not seen the gun from outside, his entry into the car was proper. Conley was investigating the status of a car with a sounding alarm. The occupant of that car had no identification – none that he offered Conley. Martinez could not work the radio, according to Conley. With loud music, it would be reasonable, effective law enforcement to lower it so the officer could attempt to talk to the people who were there. The officer does not have to do his investigation accompanied by Beethoven's Fifth at 300 decibels. It was reasonable for the officer to get into the car to turn down the music.

If the gun is on the console – and "on" includes half-buried in one of its nooks – as opposed to being inside a closed compartment, then the officer's ability to see the gun while reasonably performing his legitimate responsibilities would make that a proper discovery. If it were in a closed compartment and discoverable only by opening closed compartments, it probably would have been illegal. It was not at all likely to have been in the glove compartment or the closed part of the console.

8.   *Conclusion.*

Officer Conley responded to an alert from OnStar. It was constitutionally reasonable for him to enter the shop's service yard and to enter the car to turn down the radio and press the OnStar button. The gun ocularly identified during this process is admissible.

Signed on July 20, 2007, at Houston, Texas.

_____
Lynn N. Hughes   USDJ
United States District Judge